UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      vs.                                         No.  1:25-cv-00528

$487,753.48 from Smart Logistics PNC
Account ending 3776,

$606,050.76 from KJS Dwelling PNC
Account ending 7793, and

$799,562.11 from Get It Together
Construction Truist Account ending 1764,

      Defendant Property.

_____/

## **VERIFIED COMPLAINT FOR FORFEITURE IN REM**

NOW COMES Plaintiff, United States of America, by and through its attorneys, Andrew Byerly Birge, Acting United States Attorney for the Western District of Michigan, and Daniel T. McGraw, Assistant United States Attorney, and states upon in formation and belief that:

## **NATURE OF ACTION**

1.    This is a civil forfeiture action filed pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and Supplemental Rule G(2) of the Federal Rules of Civil Procedure to forfeit and condemn to the use and benefit of the United States of America the following property:

        a.   $487,753.48 from PNC Bank Account No. ending 3776 in the name of Smart Logistics, LLC (the "Smart Logistics PNC Account ending 3776");

1

b. $606,050.76 from PNC Bank Account No. ending 7793 in the name of KJS Dwelling, LLC (the "KJS Dwelling PNC Account ending 7793"); and

c. $799,562.11 from Truist Account No. ending 1764 in the name of Get It Together Construction, LLC (the "Get It Together Construction Truist Account ending 1764)

(the "Defendant Property").

## THE DEFENDANT IN REM

2.    The Defendant Property consists of

a. $487,753.48 from PNC Bank Account No. ending 3776 in the name of Smart Logistics, LLC (the "Smart Logistics PNC Account ending 3776");

b. $606,050.76 from PNC Bank Account No. ending 7793 in the name of KJS Dwelling, LLC (the "KJS Dwelling PNC Account ending 7793"); and

c. $799,562.11 from Truist Account No. ending 1764 in the name of Get It Together Construction, LLC (the "Get It Together Construction Truist Account ending 1764)

that was seized on or about December 20, 2024 by the Federal Bureau of Investigation ("FBI") pursuant to seizure warrants authorized by the U.S. District Court for the Western District of Michigan. The Defendant Property is currently in the custody of the United States Marshals Service ("USMS").

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1345 and 1355(b)(1)(A), because this action is being commenced by the United States of America as Plaintiff, and the acts giving rise to the basis for forfeiture occurred in this judicial district.

4.    Venue is proper before this Court pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to forfeiture occurred in this judicial district,

and/or pursuant to 28 U.S.C. § 1395(b), because the Defendant Property was found within this judicial district.

**BASIS FOR FORFEITURE**

5.     As set forth below, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because it is any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or any property traceable to such property; and pursuant to 18 U.S.C. § 981(a)(1)(C) because it is any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343.

6.     Under 18 U.S.C. § 1343, it is a criminal offense for anyone who has devised a scheme or artifice to defraud, or anyone who has devised a scheme or artifice to obtain money by means of false or fraudulent pretenses, representations, or promises, to transmit by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.

7.     Under 18 U.S.C. § 1957(a), it is a criminal offense for anyone to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property of a value greater than $10,000" that "is derived from a specified unlawful activity." "Criminally derived property" includes "any property constituting, or derived from, proceeds obtained from a criminal offense," and "specified unlawful activity" includes wire fraud in violation of 18 U.S.C. § 1343.

## FACTS SUPPORTING FORFEITURE

<u>Background Regarding Michigan Medicaid Reimbursements</u>

8.    To be eligible to submit health care claims and to receive health care reimbursements from the Michigan Medicaid Program, heath care providers must first enroll online, through the Michigan Department of Health and Human Services ("MDHHS") Community Health Automated Medicaid Processing System ("CHAMPS").

9.    As part of the onboarding process with the Michigan Medicaid Program, participating health care providers must register an account with the Statewide Integrated Governmental Management ("SIGMA"), administered by the Michigan Department of Technology, Management, and Budget ("MDTMB") in Lansing, Michigan, within the Western District of Michigan.

10.    The State of Michigan implemented SIGMA in or around October 2017 to, among other things, allow vendors and providers to register in one place to receive payments from the State of Michigan. Before that implementation date, existing Michigan Medicaid provider accounts were converted from the State of Michigan's legacy payment system to SIGMA. Providers were required to log into SIGMA and claim their accounts by July 30, 2017.

11.    Health care providers use an online vendor portal, the SIGMA Vendor Self-Service ("VSS"), to register accounts, maintain accounts, and perform financial inquiries. Through VSS, providers identify an account contact by name, e-mail address, and phone number. After confirming the registered e-mail address through

4

a VSS-generated e-mail, providers enter additional information to create SIGMA accounts, including, where applicable, Social Security Numbers, Tax Identification Numbers, Employer Identification Numbers, and National Provider Information Numbers. Providers also list Electronic Funds Transfer ("EFT") information for their bank accounts to receive electronic Michigan Medicaid reimbursements. Providers identify bank accounts by account numbers, account types (checking or savings), ABA numbers, and routing numbers. For existing Medicaid providers, the State of Michigan migrated this information into SIGMA from the state's legacy payment systems.

12.    Michigan Medicaid providers submit health care claims through CHAMPS. Claims are adjudicated through CHAMPS and reimbursements are electronically routed from Lansing, Michigan to providers' bank accounts through the account information provided in SIGMA.

13.    The VSS site provides a "Guest Access" function that allows the public to search for provider accounts, by business names, through a "Vendor Registration" tab. Publicly-available information from these search results includes providers' Vendor (SIGMA Account) Numbers and the e-mail addresses for providers' current SIGMA account administrators. The VSS site instructs users to contact the account administrator to obtain login credentials for a VSS account.

14.    An FBI investigation revealed a scheme to fraudulently induce SIGMA support personnel to disclose Michigan health care providers' SIGMA account access credentials, thereby allowing unknown individuals to access providers' SIGMA

accounts, change bank account information, and divert millions of dollars in Michigan Medicaid reimbursements.

<u>Diversion of Bronson Healthcare Group Medicaid Reimbursements</u>

15.     In or around October 2021, MDHHS advised law enforcement regarding the diversion of Michigan Medicaid reimbursements from several large hospitals and health systems in the State of Michigan, including Ascension Macomb Oakland Hospital, Bronson Healthcare Group ("Bronson"), and Beaumont Hospital.

16.     On or about July 7, 2021, SIGMA received a letter via facsimile that was ostensibly from Bronson, a multi-specialty health care organization based in Kalamazoo, Michigan, within the Western District of Michigan, that offers, among other things, primary care, advanced critical care, and inpatient hospital services throughout southwest Michigan and northern Indiana. Bronson's provider network includes Bronson Battle Creek Hospital ("Bronson Battle Creek"), a 228-bed community hospital in Battle Creek, Michigan, within the Western District of Michigan, that participates in the Michigan Medicaid program.

17.     The July 7, 2021 letter was ostensibly signed by B.E., Bronson's Senior Vice President and Chief Financial Officer. The sender's contact information, included on the facsimile's header, was "BRONSON BATTLE CREEK HOSPITAL" at the phone number 1-888-233-7364.

18.     The July 7, 2021 letter, an excerpt of which is shown below, requested access credentials for Bronson's SIGMA account. Specifically, the letter requested

"user information for Miss Ridenour [Bronson's account administrator] as she is being laid off and no longer with the Group."

> July 7, 2021
>
> This is a letter to request user information for Miss Ridenour as she is being laid off and no longer with the Group. The TAX ID is 38-2776791 and Vendor code is cv0032572. Kindly send the login details to our new contact person James McKernan at james.mckernan@nanhealth.org

19.    "Miss Ridenour" refers to T.R., a lead resource cashier at Bronson, who was Bronson's VSS contact at the time. According to MDHHS, this information—that Bronson was terminating Ms. Ridenour—was false.

20.    The July 7, 2021 letter further included Bronson Battle Creek's SIGMA Vendor Number, information that was publicly available through SIGMA's "Guest Access" function. The letter requested that SIGMA send Bronson's access credentials to "James McKernan" at "james.mckernan@nanhealth.org." According to MDHHS, SIGMA sent the requested credentials to that e-mail address.

21.    The domain "nanhealth.org" was registered through Namecheap, a California-based domain name registrar. The account contact for "nanhealth.org," listed with Namecheap, is R.S. at an address on Gail Lane in Huntsville, Texas, with a phone number ending 8043 and an e-mail address of "ptrscott7@gmail.com."

22.    During a November 2, 2020 interview with the FBI, R.S. stated that they had not heard of Namecheap and denied registering any domain names through that company. R.S. reported living in Huntsville, Texas when they became an active-duty member of the United States Army in 2018. R.S. confirmed their phone number ending 8043, but denied any knowledge of the e-mail address "prtscott7@gmail.com."

7

23.    R.S. was concerned that, while living in Texas in or around 2016 or 2017, R.S. gave access to his laptop computer to a technology support representative that he found online. According to R.S., the support representative stopped returning R.S.'s calls after gaining access to the laptop. R.S. shut the laptop computer down and took it to a different service provider to wipe, resent, and rebuild the device. Based on this information, it does not appear that R.S. was involved in creating the domain name "nanhealth.org."

24.    After    SIGMA    sent    Bronson's    information    to "james.mckernan@nanhealth.org," SIGMA received a request to change Bronson's EFT reimbursement account to JPMorgan Chase Bank account number ending 6510: an account in the name of a Florida resident: L.M. (the "L.M. Chase Account").

25.    On or about September 30, 2021, a deposit of approximately $3,425,055.43 was made into the L.M. Chase Account, in the State of Florida, from the State of Michigan. This deposit was diverted health care reimbursements for Bronson Battle Creek from the Michigan Medicaid Program.

26.    During a February 11, 2022 interview with the FBI, L.M. provided the following information:

    a.    L.M. met an individual named "Anthony Miller" through Tinder. L.M. believed that Miller was an American pilot living in Germany.

    b.    L.M. never met Miller, and only communicated with him through her phone via phone calls, Google Chats, and Google Hangouts.

    c.    LM. acknowledged her ownership of the L.M. Chase Account.

8

      d.     L.M. acknowledged the multimillion-dollar deposit into the L.M. Chase Account described above. L.M. knew the money did not belong to her, knew the money came from a hospital, and had no idea how the money got there. L.M. stated that she "knew something was going on" when this money was deposited into the L.M. Chase Account.

      e.     L.M. claimed to only engage in one transfer of funds, a $5,000.00 transfer to herself through Zelle, a digital payments network, to see if the money was real. Bank records confirmed that this Zelle transfer was debited from the L.M. Chase Account.

      f.     When confronted with evidence of other transfers from the L.M. Chase Account, including several checks over $10,000.00 identified below, L.M. acknowledged that she mailed checks at Miller's direction. L.M. said that she believed the payments were to Miller's vendors, for medical supplies, because Miller had been in the hospital for over two months.

      g.     L.M. also acknowledged using some of the proceeds of the multimillion-dollar deposit to purchase cryptocurrency that she sent to Miller.

      h.     L.M. acknowledged writing checks over $10,000.00 to herself, from the proceeds of the multimillion-dollar deposit into the L.M. Chase Account, for funds that Miller said she could keep. For example, on or about October 14, 2021, L.M. wrote a check to herself in the amount of $18,693.78 out of the L.M. Chase Account.

27.     On February 16, 2022, the FBI executed a search warrant in the Middle District of Florida for L.M.'s phone, and made a forensic copy of the electronic information stored on that phone.

28.     L.M.'s phone contains certain Google Hangout exchanges between L.M. and Miller between approximately October 7, 2020 and November 1, 2020.

29.     While these Google Hangout exchanges predate the wire fraud scheme described above, the exchanges indicate that L.M. knew or suspected that accounts she was opening at financial institutions, at Miller's direction, were being used to launder the proceeds of criminal activity.

30.     For example, on or about October 14, 2020, Miller asked L.M. for the balance of a Wells Fargo account in L.M.'s name. L.M. replied that the balance was "762.38" and further identified a series of electronic deposits into the account on or about October 14, 2020:

TN UI PAYMENTS TNUIDD PMT 201013 32715205 +$275.00 10/14/20
TN DUA PAYMENTS TNDADC PMT 201013 3266591 +$120.00 10/14/20
TN DUA PAYMENTS TNDADC PMT 2010013 32653014 +$360.00 10/14/20

Upon information and belief, these electronic transfer descriptors relate to payments for Tennessee unemployment insurance ("TN UI") and Tennessee disaster unemployment assistance ("TN DUA") benefits.

31.     On or about October 14, 2020, Miller described these as "payment[s] through the company" and asked L.M. to "transfer $750 to cashapp," "to buy bitcoins," and to "send bitcoins to [an] address." L.M. confirmed, to Miller, that she purchased and sent the Bitcoins.

32.     On or about October 17, 2020, Miller and L.M. argued about Miller's request that L.M. open another bank account, in her name, at Simple Bank, a now-defunct Oregon-based neobank that closed on or about May 8, 2021. L.M. wanted to open an account "joint in both of our names and information," an arrangement Miller resisted. L.M. then told Miller that she did not "need another account for you <u>to clean money through!</u>" L.M. also wrote, "<u>Money laundering</u>." (emphasis added.) On or about October 17, 2020, Miller responded, "No babe it isn't. It's part of my retirement plan!"

33.     On or about October 28, 2020, L.M. wrote to Miller, "My online access to Wells Fargo is suspended??? I have to call them!" Miller responded, the same day: "Okay babe call them to fix it tell them you were using a VPN on your phone and that [sic] why it's was [sic] logging in from different locations and you forgot your password was changed easlier [earlier] by you."

34.     L.M.'s phone contains evidence of a web search for "Why do I need bitcoins?" on or about October 28, 2020.

35.     On or about October 29, 2020, L.M. wrote to Miller, "Actually it is a Bitcoin scam! <u>Not retirement at all, it is unemployment money</u>! They are blocking the money! Contacting the unemployment office! Too many people knew my account number so it compromised the account!" Miller responded, "<u>Just don't talk to them about the funds coming in</u>." L.M. told Miller, "Okay Anthony, you told me this was part of your retirement money! <u>Turns out it is people's Unemployment Money</u>! I hope I don't get into trouble over this! What is really going on? Bitcoin scam, and I own the account so I get left holding the bag! I am such a fool!" L.M. also told Miller

that she knew the particulars of the scheme; that "people have had their Unemployment checks intercepted and then, that intercepted money was deposited into my account" and "[t]his is really State & Government fraud you're have [sic] me involved in!" (emphasis added.)

36.    Miller responded, "Hi honey listen to me it's not a scam."  L.M. later responded, "Tell me why Wells Fargo would tell me this?  Are they lying to me? Someone hacked into the Unemployment system and redirected someone's money to my account!  Explain this to me Anthony, is Anthony your real name?  I am so confused!"  Miller responded, in part, "We're gonna fox [fix] this together okay just be calm I promise!" (emphasis added.)

37.    On or about October 30, 2020, L.M. told Miller, "If no picture of you in uniform by 4:00pm my time, I will close my Cash App, Bitstamp, GreenDot, Hangouts.  Not an ultimatum, a friggin PROMISE!  I am completely done with all of your secrets!"

38.    On or about October 30, 2020, L.M. gave Miller the password for an account with Bitstamp, a cryptocurrency exchange, using her e-mail address.  L.M. and Miller also discussed the balance of an account with Cash App, a mobile payment service.

39.    L.M. continued to communicate with Miller via Google Hangout during the timeframe of the wire fraud and money laundering scheme described above, including missed calls on or about October 22, 2021, October 23, 2021, and October 27, 2021.

12

<u>Diversion of Beaumont Hospital Medicaid Reimbursements to the Bank Accounts</u>

40.    The diversion of Beaumont Hospital's Michigan Medicaid reimbursements followed a pattern like the fraud scheme described above.  According to MDHHS, on or about July 6, 2022, an unknown caller purporting to be M.G., Beaumont Hospital's Primary Account Administrator ("PAA"), contacted the SIGMA help desk requesting a password reset for Beaumont Hospital's Account. The caller was able to provide the name of the hospital, the hospital's federal employer identification number, and the user identification number that is publicly available through SIGMA's "Guest Access" function.

41.    Later that day, the e-mail address and phone number for the primary SIGMA account administrator for Beaumont Hospital was changed. Beaumont Hospital's bank account and EFT information was also changed from Beaumont Hospital's PNC bank account to JP Morgan Chase account ending 7810 (the "A&T Wholesale Chase Account").

42.    According to MDHHS, Beaumont Hospital did not make or authorize any changes to its SIGMA account.

43.    On or about July 25, 2022, the balance of the A&T Wholesale Chase Account was $664.92.

44.    Between July 28, 2022 and August 25, 2022, the following Michigan Medicaid reimbursements were deposited from the State of Michigan into the A&T Wholesale Chase Account in Phoenix, Arizona, all of which constitute proceeds of the

wire fraud scheme. These deposits were diverted health care reimbursements for Beaumont Hopsital from the Michigan Medicaid Program.

| Date | Amount | Description |
|---|---|---|
| 7/28/2022 | $3,362,661.87 | Payment from State of Michigan to William Beaumont Hospital |
| 7/29/2022 | $2,265.50 | Payment from State of Michigan to William Beaumont Hospital |
| 7/29/2022 | $262.93 | Payment from State of Michigan to William Beaumont Hospital |
| 8/2/2022 | $2,944.00 | Payment from State of Michigan to William Beaumont Hospital |
| 8/2/2022 | $45.00 | Payment from State of Michigan to William Beaumont Hospital |
| 8/2/2022 | $15.00 | Payment from State of Michigan to William Beaumont Hospital |
| 8/5/2022 | $187,859.03 | Payment from State of Michigan to William Beaumont Hospital |

45.     On or about July 28, 2022, check number 1003—for $487,567.10—was written from the A&T Wholesale Chase Account to "Smart Logistics LLC." On or about August 1, 2022, that check was deposited into the Smart Logistics PNC Account ending 3776.



46.     As of March 7, 2024, the balance of the Smart Logistics PNC Account ending 3776 was $487,753.48.  Between August 1, 2022 and March 7, 2024, no other checks were deposited into the Smart Logistics PNC Account ending 3776.

47.     On December 20, 2024, pursuant to a seizure warrant authorized by the U.S. District Court for the Western District of Michigan, the FBI seized $487,753.48 from the Smart Logistics PNC Account ending 3776.

48.     On or about July 28, 2022, check number 1006—for $605,891.55—was written from the A&T Wholesale Chase Account to "KJS Dwelling LLC." On or about August 1, 2022, that check was deposited into KJS Dwelling PNC Account ending 7793.



49.     As of March 7, 2024, the balance of the KJS Dwelling PNC Account ending 7793 was $606,050.76. Between August 1, 2022 and March 7, 2024, no other checks were deposited into the KJS Dwelling PNC Account ending 7793.

50.    On December 20, 2024, pursuant to a seizure warrant authorized by the U.S. District Court for the Western District of Michigan, the FBI seized $606,050.76 from the KJS Dwelling PNC Account ending 7793.

51.    On or about July 28, 2022, check number 1002—for $799,557.11—was written from the A&T Wholesale Chase Account to "Get It Together Constructions LLC." On or about August 1, 2022, that check was deposited into the Get It Together Construction Truist Account ending 1764.



52.    As of December 7, 2023, the balance of the Get It Together Construction Truist Account ending 1764 was $799,562.11. Between August 1, 2022 and December 7, 2023, no other checks were deposited into the Get It Together Construction Truist Account ending 1764.

53.    On December 20, 2024, pursuant to a seizure warrant authorized by the U.S. District Court for the Western District of Michigan, the FBI seized $799,562.11 from the Get It Together Construction Truist Account ending 1764.

54.    Upon information and belief, the Defendant Property—which is comprised of $487,753.48 seized from the Smart Logistics PNC Account ending 3776, $606,050.76 seized from the KJS Dwelling PNC Account ending 7793, and $799,562.11 seized from the Get It Together Construction Truist Account ending 1764—is any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or any property traceable to such property; and (2) any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343.

## CLAIM I

55.    Plaintiff hereby re-alleges paragraphs 1 – 54, as referenced above.

56.    The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because it is any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or any property traceable to such property.

## CLAIM II

57.    Plaintiff hereby re-alleges paragraphs 1 – 54, as referenced above.

58.    The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it is any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343.

17

## REQUESTED RELIEF

Wherefore, the United States requests that the Court issue a warrant for the arrest of the Defendant Property; that due notice be given to all interested parties to appear and show cause why forfeiture to the United States of America should not be decreed; and that the Defendant Property be condemned and forfeited to the United States of America and be delivered into the custody of the United States Postal Inspection Service or the United States Marshals Service for disposition according to law; and for such other relief as this Court may deem just and proper.

ANDREW BYERLY BIRGE
Acting United States Attorney

Dated: May 8, 2025

DANIEL T. McGRAW
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

18

**VERIFICATION**

I am a Special Agent with the Federal Bureau of Investigation with personal involvement in this investigation.

I have read the contents of the foregoing Verified Complaint for Forfeiture In Rem, and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 05/08/2025 _____

STEPHEN CHRZANOWSKI
Special Agent
Federal Bureau of Investigation

19